IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v.       ) | Case No. 21-CR-00302-CRC |
| ) | |
| JOHN CLARENCE WILKERSON,   ) | |
| ) | |
| Defendant.     ) | |
| ) | |
| _____ ) | |

**DEFENDANT'S SENTENCING MEMORANDUM**

Now Comes John C. Wilkerson ("Mr. Wilkerson") by and through his attorney, Booth M. Ripke, Nathans & Biddle, LLP, to respectfully submit this Memorandum and request a sentence of 24 months of probation without home detention, including 60 hours of community service and restitution of $500.

Reasons supporting this request include: (1) early acceptance of responsibility; (2) that the F.B.I. reported Mr. Wilkerson volunteered to be debriefed and was truthful, cooperative, and did not seek to minimize his conduct; (3) personally non-violent role in-line with others who have received probation for the same offense; (4) minimal minor criminal history (a DUI conviction seven years ago); (5) successful record on seven months of pre-trial supervision including all negative drug/alcohol screens; (6) minimal public online commentary on these issues and no prior similar involvement; (7) his remorse; (8) his personal history and circumstances; and (9) that because of unique facts with Mr. Wilkerson's employment, a probationary sentence with home detention would present a greater risk to losing his job than in other cases.

This Memorandum is premised on the same idea that was proposed by the Government: probation should not be considered the automatic outcome in these cases. The responsibility to advocate for probation, when appropriate, is taken seriously. Probation is requested based on an application of the appropriate § 3553(a) factors which, for the reasons explained below, distinguish Mr. Wilkerson from persons who have been receiving incarceration or home detention, and place him more in-line with other defendants who have been sentenced to probation alone.

## INTRODUCTION

Mr. Wilkerson was first charged in April, 2021.  *See* PSR ¶ 1.  He was arrested and released the same day.  The Government never requested home detention or greater restraints at the time.  Mr. Wilkerson has been on pre-trial supervision over the last seven months.  Every report confirms he has been in compliance.  *Id*. ¶ 9 (confirming three pre-trial reports with negative drug screens and full compliance).

The facts and circumstances surrounding Mr. Wilkerson's illegal entry into the Capitol on January 6 place him in-line with other similarly situated defendants who have been sentenced to probation without home detention.  Mr. Wilkerson never posted anything online about January 6 before it happened, and in fact, was not even aware the rally was scheduled until the night before.  He had no plan to attend, or even be in the District of Columbia, until he was invited by a friend around 9:00 p.m. or 10:00 p.m. the night of January 5.  On January 6, he did not personally commit a breaking-in, or any physical violence, or any act of vandalism.  He walked in through an open door, and left within 14 minutes, which – as explained in detail below – is comparable to other

2

cases ending in probation. Moreover, he left the building early by comparison. He had already left the Capitol and was outside before any of the other rioters occupied the Senate Chamber, or Speaker Nancy Pelosi's personal office, and before one rioter was shot. While he posted something on snapchat about the incident on January 6, the two other messages the Government describes from January 10 and January 13 were private messages. They were not posted publicly on Facebook. Unlike other defendants, Mr. Wilkerson never publicly posted those private one-to-one messages on the internet. Many other defendants made postings that people saw online and could comment on or react to in real time. They placed themselves in the center of public discourse for weeks or months after January 6, including after the inauguration when Mr. Trump was no longer president. Mr. Wilkerson's case, the two private messages he sent on January 10 and 13 are messages no one other than the woman he sent them to could see.

Immediately after Mr. Wilkerson's voluntary debriefing with the F.B.I., the F.B.I. reported to the Government that he was truthful, cooperative, and answered every question they asked. He took responsibility and never sought to minimize his conduct with them. This stands in marked distinction from other defendants who have received probation without home detention, but who misled the F.B.I., refused to answer, or sought to erroneously minimize their role months later. *See, e.g., United States v. Lori Vinson,* No. 1:21-cr-00355-RBW, ECF 43 at 16 (made misleading statements about her involvement to the F.B.I.); *United States v. Danielle Doyle,* No. 1:21-cr-00324-TNM, ECF 27 at 9 (was not fully transparent with law enforcement and ended the interview when law enforcement asked questions about her entering the Capitol); *United States v. Thomas*

3

*Vinson*, No. 1:21-cr-00355-RBW, ECF 44 at 16 & 19 (he stood by, on the same call with his wife and the F.B.I., while his wife misled the FBI about things he witnessed and he may have attempted to destroy evidence).

Mr. Wilkerson has no prior criminal contacts that would require a different sentence here.  He has a prior DUI conviction that is seven years old and no other convictions since then.  Some defendants with similar criminal or traffic records as seen here have received probation in other recent cases.  *See Doyle, supra* (probationary sentence; prior criminal history of traffic and DUI arrests); *United States v. Valerie Ehrke,* No. 1:21-cr-00097-PLF (probationary sentence; prior misdemeanor for selling marijuana and some traffic offenses); *Thomas Vinson* (probationary sentence; two old DUIs).

**PROBATION IS CONSISTENT WITH SENTENCES IN COMPARABLE CASES**

Thus far in these prosecutions, there are several similarly situated defendants who pled guilty to the same offense as Mr. Wilkerson, and for whom the Government also requested short periods of home detention and/or incarceration, but who were instead sentenced to probation without home detention.  Those include the cases of: Lori Vinson, Danielle Doyle, Eliel Rosa, Thomas Vinson, and Thomas Gallgher.  *See Lori Vinson, supra* (Government requested one month of incarceration, defendant received straight probation without home detention); *Doyle, supra* (Government requested home detention, defendant received straight probation without any home detention); *United States v. Eliel Rosa,* No. 1:21-cr-00068-TNM (same as *Doyle* – probation only sentence); *Thomas Vinson, supra* (same as *Doyle* - probation only sentence); *United States v. Thomas Gallgher,* No. 6:21-cr-0041-CJN (same as *Doyle* – probation only sentence).  Others like

4

Ms. Morgan-Lloyd and Ms. Ehrke have also been sentenced to the same, or a very similar, straight probationary sentence on comparable facts and circumstances. *See United States v. Anna Morgan-Lloyd*, No. 1:21-cr-00164-RCL (defendant sentenced to probation without home detention or incarceration); *Ehrke, supra* (same).

Instead of the above cases, the Government analogizes this case to that of *United States v. Andrew Bennett*, No. 21-cr-227-JEB. *See* Government Memorandum at 16. We submit that Mr. Bennett's case is not analogous in the way the Government suggests, and it does not suggest home detention is needed here. Unlike Mr. Wilkerson – who the F.B.I. confirmed had no contacts with any extremist group – Mr. Bennett was an admirer of the "Proud Boys" and tried to connect with them.[1] *Bennett*, ECF 24 at 1, 5 (F.B.I. found he contacted the Maryland chapter about becoming a member of the "Proud Boys"). Further, before January 6, Mr. Bennett boasted about "chaos" coming on January 6, and sent a series of inflammatory public messages, showing pre-planning and intent. *Id.* at 2. He posted phrases affiliated with the Proud Boys (like "FAFO") including "Either you with me or against me FAFO!" FAFO is a phrase Mr. Bennett also wore on his clothing when he entered the Capitol, supposedly meaning "Fuck Around And Find Out." *Id.* at 4. Video showed Mr. Bennett yelling at police officers, including yelling at police "you fucking killed her," when one rioter was shot. *Id.* at 5. We submit that for sentencing his conduct is not comparable Mr. Wilkerson.

---

[1] The F.B.I. categorizes the Proud Boys as an extremist group.

For these reasons, the home detention cases cited by the Government, like Mr. Bennett's case, do not present the best comparison cases to Mr. Wilkerson's case. Mr. Wilkerson's personal circumstances and his conduct compares more closely to others who received probation without home detention.

## THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT

Mr. Wilkerson is 30 years old. PSR ¶ 41. He is the second of two children born to his parents, who raised him on a farm in rural Oklahoma. He has three other half brothers and sisters from his parents' prior to their marriage.

Mr. Wilkerson's mother reported for the PSR that he took his first regular childhood job for pay at age 11. *See* PSR ¶ 42. His father reports that Mr. Wilkerson has been a hard worker his whole life. *See* Ex. 1 (attaching letter). While in Oklahoma, Mr. Wilkerson attended public school only until the fourth grade. His parents removed him from public school and did home schooling instead. *Id*. As a young child he was expected to home school and work the farm. His family raised pigs, horses, chicken and geese. They managed acres and acres of hay. There was no shortage of work for a young boy. He was instilled with a good work ethic at a very young age.

When Mr. Wilkerson was 13, his family relocated to Maryland. PSR ¶ 45. His parents chose to home school him again, based on a program derived from their church. *Id*. ¶ 54. It was Christian-based home schooling, and his mother reports he was instilled with a Christian-based upbringing. *Id*. ¶ 42. His parents' church provided them with materials use to educate him with through their home schooling program. *Id*. ¶ 54.

6

Mr. Wilkerson kept working jobs, and graduated at 16. At that time, he started attending community college locally in Harford County, Maryland. *Id*. Mr. Wilkerson earned roughly 30 college credits. Instead of finishing a college degree, he decided to pursue work. Mr. Wilkerson continued full-time work and stopped taking classes around the age of 18.

Not long thereafter, Mr. Wilkerson's parents returned to live in Oklahoma. But, Mr. Wilkerson had steady work and decided to stay in Maryland. No other family remained. As explained below, the life Mr. Wilkerson subsequently built for himself was through on-the-job training in labor intensive jobs. He succeeded. He quickly progressed through a series of positions from a general laborer to a field engineer and eventually to managing his own job sites and his own sub-contracting business.

By the age of 16, Mr. Wilkerson was working as a laborer for a landscaping company, and after that, for a construction company. *Id*. ¶ 59. From 2011 to 2019 (roughly ages 20-28) he moved up and accepted a job as a field engineer for another company, which manufactured and installed flooring. *Id*. ¶ 58. In January, 2020, Mr. Wilkerson grew his own business out of that job and opened his home-based subcontracting business. *Id*. ¶ 56. He bids on jobs that involve pouring epoxy flooring in commercial and industrial settings. He hires other laborers as needed. Mr. Wilkerson's job is his life. He currently works about 50-60 hours a week. He is not married and has no children. During the period of his pre-trial supervision, Mr. Wilkerson has had to work on various job sites in locations as far south as Richmond,

Virginia, and as far north as Northern Maryland, and west to Charleston, West Virginia. His area covers Virginia, West Virginia, Maryland, Pennsylvania and Delaware.

One reason we are requesting a straight probationary sentence is because of the disproportionate impact a different form of a non-incarceration sentence – like home detention – could have on his ability to work. When Mr. Wilkerson has to travel longer distances to work larger projects, he stays there and lives in that town for that time. So, he may stay for two weeks in Richmond, Virginia, completing one job, then be back home before traveling to complete a different job over weeks in West Virginia, or on the Eastern Shore. At many job sites, he has to work around normal business hours when the business is closed. So, his schedule varies tremendously. He works nights, overnights, weekends and even holidays like Christmas. His business depends on being able to complete projects at job sites at times when the business can accommodate the work being completed. Dry times and other factors dictate his schedule.

Over the last six months, Mr. Wilkerson has successfully maintained a travel schedule like the above for his job, all with the pre-approval of his USPO supervision. If allowed, Mr. Wilkerson hopes to continue his same job, as is, before and after his sentencing date. Given Mr. Wilkerson's job, home detention could result in restraints that would inhibit his ability to perform his job as required.

For these reasons, a probationary sentence that includes home detention would negatively impact Mr. Wilkerson much more than many other similar defendants.

## NATURE AND CIRCUMSTANCES OF THE OFFENSE

The events of January 6, 2021, present the rare case where the "nature and circumstances" of many criminal offenses committed that day are well known. Mr. Wilkerson admitted his guilt to the Court, in interviews with the FBI, and when he very emotionally told his family as reflected in the PSR. PSR ¶ 42.

Mr. Wilkerson's specific role in this offense was more limited than other similar defendants. For example, as of 9:00 or 10:00 p.m. the night before January 6, Mr. Wilkerson had no plans at all to attend the president's rally – or even to be in the District of Columbia at all. He did not even know the rally was scheduled until the evening of January 5. Mr. Wilkerson had never before attended any rally for President Trump, nor has he since. The night before January 6, Mr. Wilkerson was at home when he received a message from a friend who said that he was going to go to the president's rally, and that friend invited him to come along.

Because Mr. Wilkerson had never attended any such event in the past, and had no plans to attend this one, his case differs from other defendants who pled guilty to the same misdemeanor and received straight probation, but who posted online about what they intended to do beforehand. *See Thomas Vinson* (on December 24, defendant posted ". . .Stand Strong, and Stand Now! If you don't you May never have the chance again! Merry Christmas and plan Well! It Will Be Wild! My President Proclaimed It So!"); *see Rosa, supra* (posted on January 2 explaining "Why I fight[]"); *see Ehrke* (posted on Facebook that she was on the way "to the breached capitol. . .").

9

Given that so much was captured on live video, we know a lot about how Mr. Wilkerson appeared.  He was dressed in normal street clothes.  He did not wear or carry any political or anti-government conspiracy theory paraphernalia.  He did not carry a flag-pole or shield.  Unlike many, he did not wear a helmet, body armor, or other gear suggesting that he expected a physical confrontation.

Mr. Wilkerson arrived at the rally after the speeches had already started.  He was in the back closer to the Washington Monument, and with the crowd noise and talking there was much he could not hear.  But, he definitely recalls the crowd started repeating that everyone is going to the Capitol.

Mr. Wilkerson walked in the crowd down Pennsylvania Avenue.  The crowd was backed-up as they approached the Capitol.  In terms of the rioting crowd's direct interactions with police, at no time was Mr. Wilkerson at the front of the crowd, or directly confronting police officers.  *See Lori Vinson, supra* (received probation without home detention, but for some period of time was at the front of the crowd and right at the police line); *see Thomas Vinson* (same probationary sentence, despite having pushed with his wife to the front of the crowd at the police line, and recording video of chanting and fights between the rioters and the police).

By the time Mr. Wilkerson got up to the Capitol building itself, an earlier crowd had already broken through, gotten inside, and pushed open the doors.  People streamed in, fast at first, then more slowly.  Mr. Wilkerson walked in after that had happened, walked around the Rotunda area, and walked out.  According to the F.B.I. video evidence, Mr. Wilkerson exited the Capitol at 2:35 p.m. and was inside for a total

10

of about 14 minutes or so.  *See* Government Memorandum at 7.  This length of time is consistent with others who pled to the same crime and were sentenced to probation without any period of home confinement.  *See Doyle* (inside for 24 minutes); *see Rosa* (inside for 20 minutes); *see Lori Vinson* (inside for 32 minutes); *see Thomas Vinson* (inside for approximately 32 minutes); *see Gallgher, supra* (inside about 10 minutes before being tackled and arrested inside); *see Morgan-Lloyd* (inside for 10 minutes).

As confirmed by the Government's sentencing recommendation, we know that Mr. Wilkerson was one of the defendants who entered and left without breaking or stealing anything, and without engaging in any physical altercation or struggle.

One factor that has been discussed in other sentencing proceedings is during what timeframe the defendant was in the Capitol.  Broadly speaking, three time periods emerge.  The first is the initial group of people who physically breached the building by breaking and entering.  After breaching, members of that first group went around and forced opened doors from the inside.  After those doors were opened, a much larger group of people began streaming into the building.  This is what I describe as the second group, and that is when Mr. Wilkerson entered.  Then some time passed after the mass of people started flowing in – but before additional breaches occurred – breaches that eventually included Speaker Pelosi's Office and the Senate Chamber.  According to the F.B.I., those additional breaches started at 2:45 p.m., with people breaking into Nancy Pelosi's Office, and then at 2:47 p.m., with people breaking into the Senate Chamber.  It was also around 2:45 p.m. when one subject was shot and killed trying to break into the House Chamber.  This additional third-stage violence continued

11

for a longer time before sufficient law enforcement had time to gather and force evacuations, finally clearing the chambers and eventually the Capitol itself.

We know from video footage that Mr. Wilkerson had already exited the Capitol by 2:35 p.m. All the images we have seen of rioters in tactical gear with zip ties on the Senate floor, or rummaging through offices and desks, happened after Mr. Wilkerson had already exited the Capitol. He left early on, when he noticed some people who looked like they were moving with a different purpose.

On these points, Mr. Wilkerson compares favorably to those already sentenced to probation (without any home detention):

- Danielle Doyle received probation only (no home detention) and was inside from approximately 2:23 to 2:48 pm, including being inside while the secondary breaches and shooting were happening.

- Eliel Rosa received probation (no home detention) and was inside from 2:35 to 2:54 pm, including being inside while the secondary breaches and shooting were happening.

- Lori and Thomas Vinson also received probation (no home detention) and were inside from approximately 2:18 until 2:50 pm, including being inside while the secondary breaches and shooting were on-going.

- Thomas Gallgher also received probation (no home detention) and remained inside after Mr. Wilkerson had already left, and did not leave voluntarily - Mr. Gallgher was tackled and arrested after about 10 minutes.[2]

---

[2] Instead of these cases, the Government suggests comparing Mr. Wilkerson's case to those of Mr. Bennett and Ms. Bustle. Mr. Bennett was inside more than twice as long as Mr. Wilkerson, he entered earlier, stayed later, and yelled obscenities at the police after filming when one rioter was shot. Ms. Bustle entered at 2:50 p.m., and also stayed longer, until around 3:10 p.m. This was well after things inside had grown even more violent, more police had amassed, and a much larger contingent of police were actively trying to clear rioters from private chambers and force evacuations. Those cases are less like Mr. Wilkerson's than those that ended without home detention.

12

In terms of sentencing recommendations for persons who pled guilty to this misdemeanor, the Government has looked to many factors, including public social media posts before and after January 6.  As stated above, Mr. Wilkerson is different from some others in that he never posted those "we are coming to fight" messages before January 6.  On the evening of January 6, Mr. Wilkerson posted videos and one picture on snapchat of himself with others along with text, which the F.B.I. paraphrased as saying: "today was a good day, we got inside the Capitol."  Snapchat is an app where one's message to friends is deleted by the app after a short period of time, so the message itself is not available.  Mr. Wilkerson did not post anything else about January 6 publicly online after that day.  A few days later, on January 10 and January 13, he sent two private messages to a woman he is friends with in which he vented and said things about these events that were untrue and which he does not believe.  This was private communication, and for that reason it differs from the case of *Jessica Bustle* (involving public posts both before and after she breached the Capitol, included posts where she publicly advocated that "Pence is a traitor" and publicly defended the rioters).  *See United States v. Jessica Bustle*, No. 1:21-cr-00238, ECF 39 at 2-3.

The two private messages Mr. Wilkerson sent to one woman were wrong.  But, they were private messages with one person.  Mr. Wilkerson spoke with the F.B.I. about them during his interview.  He answered every question asked and told the F.B.I. he did not believe those things anymore.  Unlike some other defendants who were sentenced to probation, the F.B.I. reported that Mr. Wilkerson's answers were truthful and he did not seek to minimize or excuse his crime.  *See, e.g., Lori Vinson* (made misleading

13

statements about her involvement to the F.B.I.); *Doyle* (was not fully transparent with law enforcement and ended the interview when law enforcement asked questions about her entering the Capitol); *Thomas Vinson* (he stood by, on the same call, while his wife misled the FBI).

Mr. Wilkerson's two private messages did not pose a risk to the public in the same way as some other similarly situated defendants who received probation-only sentences despite having continued to talk publicly about these events on the internet, or on television, or continuing to message others about it for far longer, even after Mr. Trump was no longer the president.[3]

## OTHER FACTORS

For the reasons stated here, and pursuant to 18 U.S.C. § 3553(a), it is respectfully submitted that home detention is not otherwise necessary to provide just punishment, provide adequate deterrence, or to protect the public.

The factors the Government has described in other cases include the following: (1) when and how the defendant entered the Capitol; (2) whether the defendant

---

[3] Danielle Doyle was apparently still sending some messages after President Biden took office, and on February 17, 2021, she sent an open source video of herself inside the Capitol. She was sentenced to probation.

Lori Ann Vinson received probation without home detention. After January 6, she made public statements defending her involvement on the television news and on Facebook. In those public statements, she said she was not sorry and would do it again.

Eliel Rosa, another defendant who received probation instead of the Government's request for home detention, publicly posted on Facebook days before January 6, a "why I fight" statement referencing the need to do "house-cleaning" over the election and then traveled to Washington from Texas. On the day of the incident, he publicly posted an "And we fight" message and picture very early in the morning.

14

engaged in or incited violence on the Capitol; (3) whether the defendant engaged in any acts of destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether the defendant destroyed evidence; (6) the length of time inside and where the defendant traveled; (7) the defendant's statements that day, or on social media; (8) whether the defendant cooperated with law enforcement; and (9) whether the defendant expresses remorse or contrition.

     As to these factors, Mr. Wilkerson walked into the Capitol through an open door, he did not break in or otherwise personally engage in violence against any person or property. He did not engage in any personal act of destruction. He did not engage in pre-planning, publicly brag about what was to come, and was not even aware the rally was to occur until the night before. His reaction once inside and he saw people starting to act with another purpose was to turn around and leave earlier than most other similarly sentenced defendants. He cooperated with law enforcement fully, and did not destroy evidence. His statements about those events were very limited and mostly private in nature. He subsequently apologized, decided to plead guilty early on, and showed remorse including having done emotionally to his family. PSR ¶ 42.

     Mr. Wilkerson knows that an important part of sentencing is to promote respect for the law, accurately reflect the nature of the crime, and to offer adequate deterrence. However, other defendants thus far who have received a period of home detention akin the what the Government requests here, appear to involve more serious facts not present here. *See, supra,* discussion of *Bennett; see also United States v. Jack Griffith*, No. 1:21-cr-00204-BAH (3 months home detention: has shown virtually no remorse and

15

little patience for the Court's proceedings; espoused extremist views online; minimized his conduct post-arrest; used arrest to promote social media presence and video game he created; publicly posted problematic videos on TikTok months after January 6; created Trump video game which glorifies killing Antifa).  As such, we do not believe the facts of those cases require home detention in this case, and given Mr. Wilkerson's employment, home detention in his case could cause an additional unnecessary burden that may jeopardize his ability to maintain his business as he has over these last months.

## CONCLUSION

   For the reasons stated here, it is respectfully requested that this Honorable Court sentence Mr. Wilkerson to 24 months of probation, with 60 hours of community service and $500 in restitution.

                Respectfully Submitted,

                /s/
_____
Booth M. Ripke
Bar # 468504
Nathans & Biddle, LLP
120 E. Baltimore Street, Suite 1800
Baltimore, Maryland 21202
410-783-0272
bripke@nathanslaw.com

## CERTIFICATE OF SERVICE

I hereby certified that on this 10th day of November, 2021, a copy of this sentencing memorandum was served on the Office of the United States Attorney for the District of Columbia, by e-filing through the Court's CM/ECF electronic document filing system, and by courtesy email to AUSA Robert Juman, counsel for the Government.

/s/
_____
Booth M. Ripke