1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
2
     - - - - - - - - - - - - - - - x
3    THE UNITED STATES OF AMERICA,
                                       Criminal Action No.
4               Plaintiff,            1:21-cr-00302-CRC-1
                                       Tuesday, November 16, 2021
5    vs.                              2:02 p.m.

6    JOHN CLARENCE WILKERSON, IV,

7               Defendant.
     - - - - - - - - - - - - - - - x
8

9    _____

10                 TRANSCRIPT OF SENTENCING
        HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
11                UNITED STATES DISTRICT JUDGE
     _____

12

     APPEARANCES:
13

14   For the United States:       **ROBERT CRAIG JUMAN, ESQ.**
                                   **U.S. ATTORNEY'S OFFICE**
15                                 500 E. Broward Blvd.
                                   Ft. Lauderdale, FL 33132
16                                 (786) 514-9990
                                   robert.juman@usdoj.gov
17
     For the Defendant:           **BOOTH MARCUS RIPKE, ESQ.**
18                                 **NATHANS & BIDDLE, LLP**
                                   120 East Baltimore Street
19                                 Suite 1800
                                   Baltimore, MD 21202
20                                 (410) 783-0272
                                   bripke@nathanslaw.com
21

22   Court Reporter:              Lisa A. Moreira, RDR, CRR
                                   Official Court Reporter
23                                 U.S. Courthouse, Room 6718
                                   333 Constitution Avenue, NW
24                                 Washington, DC  20001
                                   202-354-3187
25

```
 1                    P R O C E E D I N G S

 2             THE COURTROOM DEPUTY:  Your Honor, we're on the

 3    record for Criminal Case 21-302, United States of America

 4    vs. John Clarence Wilkerson, IV.

 5             Counsel, please approach the lectern and identify

 6    yourselves for the record.

 7             MR. JUMAN:  Good afternoon, Your Honor; Robert

 8    Juman for the United States.

 9             THE COURT:  Good afternoon, Mr. Juman.

10             MR. RIPKE:  Good afternoon, Your Honor; Booth

11    Ripke on behalf of Mr. Wilkerson, who is sitting at defense

12    counsel table.

13             THE COURT:  Okay.  Good afternoon, Mr. Ripke.

14             Mr. Wilkerson, good to see you.

15             Just a couple of ground rules before you get

16    started.  If you have not been vaccinated or would simply

17    prefer to wear your mask, please wear your mask when

18    addressing the Court.  Otherwise, feel free to take it off

19    when addressing the Court.

20             If you do wear your mask, just be sure to speak

21    clearly and slowly so the court reporter can pick up

22    everything you say, okay?

23             All right.  Are you ready to proceed?

24             MR. JUMAN:  Yes, Your Honor.

25             THE COURT:  Can you all hear me?  I'm not sure
```

1    that this mic is working properly.  Great.

2              All right.  The Court has read the submissions,

3    the presentence investigation report, the sentencing

4    memoranda from both sides, the letter from the defendant's

5    father, and I've recently received a letter from an

6    acquaintance, Mr. Brown, which I have reviewed.  Any other

7    materials for the Court's consideration?

8              MR. JUMAN:  No, Your Honor.

9              MR. RIPKE:  No, Your Honor.

10             THE COURT:  Okay.  And, Counsel, if you're going

11   to speak from the table, just speak into the mic and make

12   sure the green light is on.

13             MR. JUMAN:  Yes, Your Honor.  The microphone here

14   is not working so I'll try to go to the lectern.

15             THE COURT:  Just approach the lectern.

16             All right.  Let's start with the presentence

17   investigation report.  I note that there were some

18   objections that seem all to have been resolved by probation.

19   Any objections to the factual narrative in the report that

20   have not been satisfactorily resolved?

21             MR. JUMAN:  No objections from the government,

22   Your Honor.

23             MR. RIPKE:  No objections from the defense, Your

24   Honor.

25             THE COURT:  Okay.  Mr. Wilkerson, is that mic

1    working over there?

2              Okay.  Sir, has Mr. Ripke reviewed the presentence

3    investigation report with you?

4              THE DEFENDANT:  Yes, he has, Your Honor.

5              THE COURT:  And have you been satisfied with his

6    services in this case?

7              THE DEFENDANT:  Yes, I am, Your Honor.

8              THE COURT:  All right.  Hearing no objections, the

9    Court will accept the factual findings in the PSR regarding

10   the circumstances of the offense; and, therefore, those

11   facts as stated in the PSR will be adopted by the Court for

12   purposes of this sentencing.

13             Mr. Wilkerson has pled guilty to one count of

14   parading inside the Capitol Building in violation of 40 USC

15   5104(e)(2)(G).  That statute authorizes me to impose a term

16   of imprisonment of up to six months and a fine up to a

17   maximum of $5,000.  The statute does not authorize a term of

18   supervised release.  Pursuant to his plea agreement, the

19   defendant has agreed to pay restitution of $500 to the

20   Architect of the Capitol to help compensate for the damage

21   to the Capitol.  The offense is a Class B misdemeanor so the

22   federal sentencing guidelines do not apply.

23             Have I stated the circumstances of the plea and

24   the governing statute correctly?

25             MR. JUMAN:  Yes, Your Honor.

```
1              THE COURT:  Mr. --

2              MR. RIPKE:  Mr. Ripke, on behalf of Mr. Wilkerson,

3       yes, you have, Your Honor.

4              THE COURT:  Okay.  The probation office has

5       submitted a recommendation of a period of 36 months

6       probation along with the $500 agreed-upon restitution.

7              Mr. Juman, would you like to address the 3553(a)

8       factors?

9              MR. JUMAN:  Thank you, Judge, yes.  I don't have

10      much to add beyond what's in our papers.  I think we laid it

11      out, but I do want to respond briefly to some points the

12      defense has made.

13             First, the defendant takes a sort of granular look

14      at a number of the other Capitol riot cases; and the

15      government agrees, and we are analyzing these misdemeanor

16      cases very carefully in order to avoid any sentencing

17      disparities, but I guess I want to point out there's a limit

18      to how precise these comparisons can be.

19             The goal here is consistency, not identity.  Given

20      the number of defendants in these cases, there are going to

21      be endless permutations of mitigating and aggravating

22      factors that can be used to compare to the defendants, but

23      we can't say, for example, that this many minutes inside the

24      Capitol requires one sentence and this many minutes requires

25      another sentence or that a mitigating factor like voluntary
```

1    surrender equals or is in opposite to the aggravating factor

2    of a social media post.

3            The point is the government's putting these cases

4    on a spectrum, identifying the most serious and the least

5    serious, and making sure as a whole that the government's

6    being consistent with its recommendations.

7            As we laid out in our papers --

8            THE COURT:  And just out of curiosity, I've

9    inquired of other government counsel concerning this as

10   well, but mechanically, how has the government been going

11   about doing that?  Is there a committee?  Is there -- you

12   know, how are you all assuring yourselves that there is

13   rough consistency across all the cases?

14           MR. JUMAN:  Yes, Your Honor.

15           I think it's fair to say there's not a formal

16   committee.  Every sentencing memorandum is run through the

17   same procedure.  There are certain AUSAs who have been

18   designated to focus on this who have experience with all of

19   the sentencings.  There's also a role for the supervisor to

20   play.

21           So every sentencing memo gets approved by those

22   two layers of supervisory approval, and then they get kicked

23   back to the AUSA to present in court.

24           THE COURT:  Okay.

25           MR. JUMAN:  So, again, I want to, I guess, sort of

1    focus on that.  We've identified in our papers two of the

2    cases that we think are comparable, but, again, we mention

3    them not because they mandate a particular sentence in this

4    case but merely because they show that the government's

5    recommendation here would not lead to wildly disparate

6    sentences.

7         Our recommendation in this case is probation with

8    60 days of home detention, and, again, we're not that far

9    apart from the defense.  The defense is recommending two

10   years of probation.  We're recommending three years.  We're

11   recommending --

12        THE COURT:  What would be the terms of home

13   detention?  The defense obviously focuses on his work and

14   the need for him to continue to work over the next couple of

15   months.  Would he be allowed to work under the government's

16   conception of home detention or not?

17        MR. JUMAN:  Your Honor, that would be up to

18   obviously the Court.  We're not proposing home detention

19   specifically to deprive the defendant of the ability to

20   work.

21        I would note that the concern raised in the

22   defense submission is a bit speculative.  He's not

23   identified a specific job that he'd have to forgo.  If the

24   Court wanted to modify the home detention to knowledge of a

25   particular assignment in a different location, I don't think

1    that's a problem, and I think that's something that can be

2    dealt with on a case-by-case basis with probation.

3              THE COURT:  Right.

4              MR. JUMAN:  I really think our point is that we're

5    trying to emphasize the need for there to be something more

6    than just the baseline of probation.

7              THE COURT:  Right.

8              MR. JUMAN:  I think in our --

9              THE COURT:  Why hasn't the government recommended

10   a fine in this case, particularly if -- I mean, A, would

11   that not be a better way to acknowledge the seriousness of

12   his conduct as compared to, you know, sitting at home

13   watching ESPN and Cable News, particularly if he's allowed

14   to work?

15             If he's allowed to work, then home confinement is

16   essentially a curfew to stay home at nights for 60 days,

17   right?  Why wouldn't a fine be a more appropriate sanction

18   under the circumstances?

19             MR. JUMAN:  Your Honor, I can't tell you that it

20   wouldn't be more appropriate.  I think that we were

21   considering it.  I know it was something that I was thinking

22   about in the initial drafts of the PSR.

23             Ultimately probation, which, you know, received

24   the financial records, concluded that the defendant doesn't

25   have the ability to pay a fine.  We're not looking to create

1    that kind of an issue with these cases, but it absolutely --

2    when we say that we think something more than probation is

3    necessary, that's within -- well within the realm of options

4    that the Court has, and I wouldn't say that that would be

5    improper.

6              And, again, I also don't want to suggest that we

7    think home detention would necessarily allow the defendant

8    to work.  There does need to be some penal component to it.

9    So if it means, you know, staying at home when he otherwise

10   would not, that may be a necessary consequence of home

11   detention.

12             In any event, I really do want to focus on that

13   aspect to it.  Your Honor has the discretion to impose more

14   than three years of probation.  I couldn't say that that

15   would be improper either.  Our point is simply that based on

16   our analysis we think three years probation and 60 days home

17   detention is consistent and is appropriate given the facts

18   of this case.

19             THE COURT:  For the record, Ms. Gavito from

20   probation is present since we have invoked the specter of

21   probation a couple of times.

22             MR. JUMAN:  Right.  So I do want to just make

23   clear why we think that's the appropriate sentence in this

24   case; but, again, when I say that's the appropriate

25   sentence, I really do mean something more than just flat

1      probation is appropriate.

2              First, there are the reasons, based on

3      Mr. Wilkerson's own conduct and his history, the points we

4      made in our papers, that he left the rally early in order to

5      be one of the first rioters to enter the Capitol grounds.

6      He saw and recorded the violence that was happening, and his

7      statements, although they were not public, they still shed

8      light on his intent and his lack of remorse, and then there

9      is that incident described in Paragraph 37 of the PSR which

10     raises some concerns about his attitude towards law

11     enforcement.

12             But there are reasons beyond those which are

13     contemplated by the 3553 factors which the government's

14     asking the Court to consider.

15             First -- and it's almost become cliché at this

16     point -- this crime was unique in American history.  This

17     wasn't an attack on a building.  It was an attack on an

18     election.  It was an attempt to overturn an election through

19     force, but it was also an attack on the rule of law.

20             By the time the defendant arrived at the Capitol

21     along with the other rioters, the ordinary mechanism for

22     contesting an election -- lawsuits in courts of law -- had

23     been tried and hadn't succeeded.  So the rioters who invaded

24     were aware they had lost in court, and instead of accepting

25     those results they were resorting to force.

1        And this really was an attack not just on the

2    legislature but on the judiciary as well, and the uniqueness

3    of those targets warrants a similarly unique sentence.  And

4    that's at every level, from the lowest misdemeanors to the

5    highest felonies.

6        This case also presents a unique need for

7    deterrence, both general and specific.  Specific because the

8    defendant's statements after January 6th -- bragging about

9    it being a good day -- and his posts, again private, they

10    displayed a distressing lack of an understanding as to how

11    democracy works and the concern that he would act similarly

12    the next time he's not happy with how an election goes.

13        And general deterrence because --

14        THE COURT:  Who did he send those posts to?

15        MR. JUMAN:  Your Honor, all we know is that it's a

16    friend on Facebook.

17        And then also I want to raise general deterrence

18    because even now, as the Court is, I'm sure, aware, there

19    are public figures denying that the Capitol riots were a

20    serious crime, and there are people continuing to spout the

21    lies that motivated the riot.  So this is a uniquely

22    important consideration in these cases.

23        And, finally, we ask the Court to consider the

24    victims -- the Capitol Police officers, Metropolitan Police,

25    other law enforcement officers -- who frankly went through

 1    hell that day.  And it's not just physical assaults, but

 2    verbal assaults and the fear of being surrounded by a mob.

 3    The defendant did not attack anyone physically, and that's

 4    why he's not charged with a felony, but you can't have a

 5    riot without rioters, and so by making himself a member of

 6    that mob, he added to the burden on law enforcement that

 7    day.

 8          So for all of those reasons we submit that

 9    something more than probation is appropriate, and we're

10    recommending the 60 days of home detention as well as -- I

11    don't think there's any dispute about this -- the 60 hours

12    of community service as well as --

13          THE COURT:  There seems to be some dispute or at

14    least a dispute over the characterization of whether he was

15    in the first wave or the second wave.  How many minutes

16    after the first breach did he enter the Capitol?

17          MR. JUMAN:  Your Honor, my understanding is --

18    well, again, it depends on what you mean by the first

19    breach.  The door he went through was the Senate Wing door.

20    He entered that location approximately eight minutes after

21    it had first been -- the window had been broken.

22          THE COURT:  Okay.

23          MR. JUMAN:  I think the relevance of that really

24    is limited to the fact that by that time there's glass on

25    the floor and that piercing alarm is sounding, and that's

1    the environment in which he chose to enter.  I don't think

2    there's a --

3              THE COURT:  Did the people who first entered that

4    door have to overcome law enforcement in order to enter, or

5    did they just break it down?

6              MR. JUMAN:  In order to get to that location there

7    was a prior -- there were two prior breaches really.

8    There's a breach that occurs at the Peace Circle at

9    approximately 12:53, and that's the image that I've put in

10   the sentencing memo.  The defendant is shortly after that

11   breach at that location close to the Peace Circle.

12             THE COURT:  Is it fair to assume that he would

13   have observed his cohorts overcoming Capitol Police in order

14   to -- you know, in order to get himself to the Capitol?

15             MR. JUMAN:  More than fair, Your Honor.  The

16   second breach is the one that takes place on the West Plaza,

17   and there we've included in our submission the picture of

18   the defendant holding up his phone taking a picture, and you

19   can see in the foreground the officers being confronted by

20   rioters.

21             Once that breach occurs, then the tide flows up

22   the steps to the West Senate doors, and that's where he

23   enters.  So that's what I mean by the two breaches that

24   occurred prior to his entry.

25             THE COURT:  Okay.  There was a reference in your

1    memo or perhaps in the statement of facts supporting the

2    arrest warrant that he was on a walkie-talkie as he went in.

3            MR. JUMAN:  Yes, Your Honor.

4            THE COURT:  Any sense of who he was communicating

5    with or any argument that he may have been coordinating his

6    efforts with others?

7            MR. JUMAN:  Your Honor, we did see that in the

8    video, and we have no -- we're not able to derive any

9    evidence that he was in communication with anyone in

10   particular.  And the agents have, you know, tried to find

11   that out, but were unsuccessful.

12           We're not alleging that there was anyone else that

13   he was in communication with.

14           THE COURT:  Okay.  Thank you.

15           MR. JUMAN:  Thank you, Your Honor.

16           THE COURT:  Mr. Ripke.  Good to meet you in

17   person.

18           MR. RIPKE:  Thank you very much, Your Honor.  It's

19   good to meet you, too.  Thank you for your questions as

20   well, Your Honor.  It was helpful to hear them.

21           I -- there were two points that I remembered or

22   learned after I filed my sentencing memo, which are probably

23   not major, but I did want to mention them because I failed

24   to -- I would have mentioned them in my memorandum.

25           One is that he did spend -- as I saw it mentioned

1   in other memoranda that I read from other cases and I didn't

2   mention in mine, he did spend a night in jail originally

3   when he was arrested in this case in the basement before he

4   could be brought up for his -- there was no decision to

5   detain.  It was just a matter of the timing as to when he

6   could be brought in.

7            So I didn't mention that --

8            THE COURT:  The basement of the Capitol or --

9            MR. RIPKE:  I believe it was of the courthouse,

10  Your Honor.

11           I wasn't there.  I didn't get hired until

12  weeks later so -- and I didn't appear for that hearing.  But

13  he did spend the first night overnight before he was

14  released --

15           THE COURT:  Where was he arrested?  In D.C.?

16           MR. RIPKE:  In Maryland.

17           THE COURT:  In Maryland.

18           MR. RIPKE:  North of Baltimore, in Harford County,

19  Maryland.  It's about an hour north of here, a little bit

20  more than that.

21           So that's one point I didn't mention.

22           And since my memo was filed, I'm aware of two more

23  cases where two other defendants who pled guilty to the same

24  crime were also sentenced.  In those cases -- I'm sure the

25  Court has got a better -- and the government has a better

1    understanding of all these cases than I do, but the

2    defendants' names were Sanders in one and Cordon or "Cor-

3    Doen" in the other one.  Those were both cases that the

4    government requested home detention.  I believe one was for

5    two months and one was for three months.

6            In both cases it's my understanding that the

7    individuals were sentenced to probation without home

8    detention in those cases.  Other than that, I didn't see

9    anything unique about them.  They fit generally the

10   narrative that I provided.

11           We are obviously here today because my client made

12   the decision to go inside the Capitol, and he's guilty, and

13   he pled guilty.  And he pled guilty because he is guilty,

14   and nothing I said in my memo or want to say today should in

15   any way distract from that.

16           The government I think correctly noted -- I don't

17   know if I agree with "granular," but a very specific

18   approach in my sentencing memorandum.  I recognize this is

19   an extremely serious matter, and you look at those -- if

20   you're in my position, you become -- you've got access to

21   see videos and things that the public has not seen, and I

22   take my burden equally seriously, and what I say is my

23   burden to prove what I believe is that probation is not

24   appropriate as the answer in all these cases or universally,

25   as the government said.  I agree with that.  And my burden

1    is to show that something like this would never happen again

2    with this man.

3              And so I did dig into all of the cases that I

4    could get my hands on, and I looked at how things -- and

5    none of it, none of it -- and Mr. Juman -- we worked

6    excellent -- one of the shining lights of this case is the

7    FBI agents I worked with and with Mr. Juman in terms of my

8    personal experience because it was extremely professional.

9              So I'm not here to just repeat all the contents of

10   my sentencing memorandum, but I did feel like it was not

11   designed to say the government recommended this here or this

12   there.  The government has recommended home detention in a

13   number of cases, and the individuals had -- some of them

14   have been sentenced to home detention and some have been

15   sentenced to probation.  So I did want to look at those

16   cases and provide the Court with as much information as I

17   could, obviously from my perspective, on what happened in

18   those cases, and Your Honor could give it whatever weight

19   the Court sees fit.

20             One of the things that I asked my client point

21   blank -- and he spoke with the FBI agents point blank.  I

22   was there for the interview.  We went to the FBI

23   headquarters.  We were there for over an hour, four of us in

24   a room together with masks and a recorder in the middle.

25   They asked every question that they could.  Their approach

1    was systematic.  It was methodical.  It had a very -- I've

2    sat in these before.  They knew where they were going.  And

3    they asked about the messages.  They asked about everything.

4    And the report I received back -- and I understand that the

5    agent called Mr. Juman immediately afterwards -- was that he

6    was completely truthful and honest, and they were satisfied

7    with his answers.

8            His answers, to me, were similar to what he

9    said -- he had ten pages of notes with the FBI -- that he --

10   that those messages, in the first days after this happened,

11   were him -- examples of him not realizing what was really

12   going on.  And let me tell you what he explained to me about

13   that because some of us, we try to find, even in a tragedy,

14   some bright hope or some hope at all.  And what he told me

15   was that one of the good things that came out of this for

16   him personally is he became unplugged.

17           Where he lives, he doesn't have WiFi.  He doesn't

18   have cable TV.  He doesn't have a land line.  He doesn't

19   subscribe to a newspaper.  He received his news and

20   information through his telephone and primarily through apps

21   like Facebook and other kind of messaging things, and he was

22   paying attention to that stuff.  I'm talking now about the

23   period of time after the pandemic during the lockdown before

24   January 6th.  And he allowed himself to fall into -- and

25   he's responsible for this; no one else -- that he allowed

1    himself to fall into this situation where he spent too much

2    time, an inordinate amount of time, paying attention to and

3    following information from these sources.

4         What he told me was that after he got arrested,

5    and they took his phone away, which they imaged, and then he

6    went home, he had nothing -- or at least initially -- there,

7    and he didn't go back to Facebook socially for connecting

8    with people after that at all.  And so it was a matter of

9    weeks when he became disconnected from it where he described

10   as deprogrammed.

11        He stopped -- he realized that these things that

12   he was paying attention to had taken up an inordinate amount

13   of time in his mind and his life and what -- and so he

14   started to realize the other things that were really more

15   important:  his job, his work, his life, his freedom.

16        THE COURT:  Well, I obviously understand that

17   argument.  The challenge for me and my colleagues in this

18   and many other cases is to distinguish remorse that comes

19   after an arrest versus true remorse, and that is in many

20   cases an unknowable and very difficult proposition, right?

21        But that's why I asked Mr. Juman the question what

22   is it fair to assume that he saw as he was going in?  You

23   know, and if it's fair to assume he saw, you know, his

24   fellow travelers assaulting police officers and breaking

25   windows in order to get into the Capitol, yet went in

1  anyway, and then the next day after obviously, you know, or

2  presumably having seen what unfolded on television sent a

3  text message saying that was a good day, or, you know, if

4  there's another rally on the East Coast, I'm there -- and

5  you know what else he said, right?

6          MR. RIPKE:  Uh-huh.

7          THE COURT:  You know, were those statements his

8  true beliefs, or is he now truly remorseful only after he is

9  being called to account for it?  I mean, you know, how do I

10  assess that in this case as a judge?

11          MR. RIPKE:  It's a very fair question, Your Honor.

12  Let me try to answer it.

13          The -- I think that one way we can tell is this.

14  He was not arrested or charged, unlike a lot of the cases we

15  talked about, for more than three months after this incident

16  happened.  So for three months afterwards he hadn't -- a lot

17  of the other cases were in January and February.  He was on

18  April 7th.  For a long time after that he didn't have any

19  awareness in the moments where other people were getting

20  arrested and stuff that he was going to get drawn up into

21  it.

22          The messages we saw were within six days after the

23  events happened.  They were two messages, private text

24  messages, effectively to one person.  They stopped after

25  that, and there was nothing else that happened.  And nothing

1    else happened for 80 days until he got arrested.

2              Something changed.  Some message got through even

3    before the arrest and the conviction and getting locked up

4    for a night did, and I would take that as a sign.

5              He -- as much as I said -- I'm not trying to

6    suggest in any way he didn't understand there was a line

7    that he crossed, and he saw more than enough that he should

8    have known not to go in there.  So I -- that I would offer

9    to Your Honor.

10             Also, I will say -- I don't know that this is good

11   for him, but the messages were not truthful.  He's never

12   been to a single rally for a former president or anything

13   before or after that date.  He had never been involved in

14   any of that stuff before.  He had no plans at all to attend

15   this rally or participate in this thing until the night

16   before.  A friend that he ended up riding down with invited

17   him about 9:00 or 10:00 p.m. the night before to come along.

18             And so that's why this case is different from many

19   of the others Your Honor will have seen which contain from

20   the day after the election, for months or weeks or days,

21   messages from people about what they intended to do, what

22   they were going to do, what they wanted to do, and there's

23   none of that in this case.

24             And, you know, those messages are horrible.  The

25   difference between this one --

1          THE COURT:  So was he boasting?  Did he really

2     believe that?  Was he trying to convince the recipient of

3     the message of something that he knew not to be true?

4          What's the context for those messages?

5          MR. RIPKE:  There's nothing -- there's nothing

6     good -- it was a woman who he was friends with.  That's what

7     it was.  And he had -- there's no other content like that on

8     his, you know, messages with anyone around that time except

9     for one woman that I know he was trying to impress with a

10    message at 1:00 in the morning that was a lie.  But that's

11    what it was.

12          I do believe, from talking to him, that he

13    believed things at that time that are not true and were not

14    true and he realizes weren't true now.  That's part of what

15    I was saying earlier.

16          As bad as it is, he did make it private, not

17    public.  He did end it on his own 80 days before he got

18    arrested.  There was nothing before that day of any kind

19    whatsoever, and he was -- he was much -- maybe equal parts

20    stupid boasting as anything else.

21          Your Honor --

22          THE COURT:  What do you make of the events

23    described in Paragraph 37 of the PSR?

24          MR. RIPKE:  Thank you, Your Honor.

25          THE COURT:  And does it show a particular

1    disrespect for law enforcement, or no?

2             MR. RIPKE:  I don't believe it does, but that's

3    because I know more about the events.

4             THE COURT:  Okay.

5             MR. RIPKE:  What happened -- first of all, the

6    events resulted in all the charges being dropped and

7    dismissed.  There was no conviction.  I thought that they --

8    I wasn't involved.  I thought they were expunged.  I

9    understand that we can find stuff even if it's expunged, but

10   all the charges were dropped and dismissed.

11            At the time there -- my client -- I'm saying this

12   because it's the truth.  My client has a couple of medical

13   conditions.  Some of which were at play that night; none of

14   which were in play in this case at all.  And so I didn't

15   talk about any of that in the sentencing --

16            THE COURT:  It could have ended a lot more

17   seriously.

18            MR. RIPKE:  Yes.  Yes.

19            THE COURT:  And I'm not talking about charges

20   being filed, right?

21            MR. RIPKE:  He's very lucky.  We're all too

22   familiar with people in a position to be on the road that

23   night that didn't get their freedom to walk away.  I

24   understood that.  I know he understands that.

25            I can tell you that he had a lawyer that presented

1  some medical evidence, that a decision was made by the

2  prosecutor who reviewed the case that it wasn't worth

3  prosecuting or presenting to a court, and the charges were

4  dismissed.

5          THE COURT:  Okay.

6          MR. RIPKE:  I don't think any of the other

7  things we've talked -- this particular situation on this

8  day, Mr. -- January 6th I'm talking about -- Mr. Juman had

9  one photo of Mr. Wilkerson where he stood.  I have another

10  one where he's standing further back.  He was standing

11  forward and back.  He was never standing in the front row.

12          He was never interacting with those police

13  officers directly.  He wasn't -- the things we've heard said

14  in other cases, even a couple that I've cited where they

15  were ultimately sentenced to probation only and not home

16  detention, are people who were in the front row, people who

17  were interacting directly with the police officers, people

18  who were making those comments.

19          And we have video of every minute of where

20  he was when he was in and out of there.  I'm not kidding.

21  Mr. Juman said eight minutes.  It was nine minutes.  I've

22  seen them all.  I know exactly where he was.  He went into

23  the bathroom, came back out, stood there for a minute and a

24  half like he's looking for people at the door, and goes back

25  in.

1            These people had the opportunity to distinguish

2    themselves one way or the other when they were in there, and

3    I don't think that 14 minutes is different from 15 or 20.  I

4    don't think any of that stuff.  I -- but I think they're

5    facts, and we try to give the Court as many as we can and

6    let the Court decide.

7            I wanted to touch on -- on -- well, briefly, I put

8    some personal circumstances and background for my client in

9    there that came from his father's letter and from the PSR.

10   I know the Court's familiar with that.  I don't want to

11   rehash that at all here.

12           He was born on a rural farm in '91.  He attended

13   public school until about fourth grade and was home schooled

14   after that and worked.  He graduated from home schooling at

15   age 16 and has been working full time since then.

16           The -- I outlined two jobs he had with

17   construction companies and then formed his own business.  In

18   effect they're all the same.  The company he had first

19   worked for is very much like the company he has now.  They

20   were both subcontractors of another company.  They're all

21   named in the PSR.  And that company is the one he worked for

22   in between.

23           So he worked his way up through these positions,

24   and one of the -- one of the tragedies of this honestly is

25   that his time in his life -- he was 29 on January 6th.  He

1    was 29 on the day he was arrested.  He's 30 now.  After 15

2    years, from age 16 approximately, in that business he had

3    gotten to the point, notwithstanding the pandemic, where he

4    was in a position, coming out of the pandemic, that his

5    business could have really grown.

6              And he made $60,000 last year.  He lost one

7    contract during his period of supervision, a three-month

8    contract at an installation, where it would have paid

9    $90,000 in three months.  And so he couldn't get on the

10   installation to do the job because of this -- because of his

11   guilt in this case.

12             So he has -- he's done something that he will

13   never live down.  He's -- this conviction will never go

14   away.  The line of work that he wants to do and he's doing

15   is -- he's going to have to answer for it on background

16   checks and other kinds of ways.  And he should.

17             There was but a specific example of one three-

18   month-long assignment that he lost.  Mr. Juman was saying I

19   was less than specific, but Example One, he was working a

20   job in Richmond, Virginia, during probation.  All this stuff

21   was approved by supervision ahead of time.  No problems.  He

22   was down there in Richmond for weeks where he just basically

23   lives down there and works the job.

24             When we met to meet with the FBI agents here in

25   Baltimore, he was working -- he worked that evening.  After

1    the business closed, then he was going to drive overnight

2    back to Baltimore to meet with the agents and me, and then

3    get in the car and drive back down again to Richmond the

4    next day in order to do the work when the next shift ended.

5          He was in Charleston, West Virginia.  He was in

6    Frederick, Maryland.  He was in -- he has not been on the

7    eastern shore or Delaware during his period of supervision,

8    but his work area covers those locations as well.

9          THE COURT:  These charges did not impede him from

10   completing those jobs, correct?

11         MR. RIPKE:  It did not on those.

12         THE COURT:  Okay.

13         MR. RIPKE:  There's another opportunity that it

14   might.  The company that laid him off when he opened his own

15   business has offered him a -- well, they're in the process

16   of going to offer him a job and a promotion if he wanted to

17   come back, put him in charge of a Midwest region there,

18   which would be a 30 percent increase in his income from last

19   year.  I think he wants to continue his own business, but,

20   you know, they would have to reckon with this as well.

21         So I don't have, you know, a specific list of jobs

22   here today to say this one, this one, this one would work,

23   this one wouldn't work, but what he's basically done for the

24   last seven months is give his jobs to his agent on a regular

25   basis and get permission to travel to these locations and be

1    back when he's supposed to be back.  And, you know, he's

2    been able to do that.  That has worked.

3          Your Honor, in the government's presentation

4    it mentioned the possibility of a fine, and I know the

5    PSR indicates an inability to pay the fine.  If the Court

6    is interested in something more than probation and is

7    looking -- the advantage to a fine is you can continue to

8    work, and you can pay it over time.  You don't have to pay

9    it all today.  And I'm aware of what the fines have been in

10   other similar cases.

11         That would be easier, you know, to handle, quite

12   frankly.  I really presented that stuff as much to show that

13   there is something different personally for somebody on home

14   detention versus some of the other ones I've seen where

15   somebody's retired or somebody works from home or somebody

16   is unemployed other than in the home doing work.  It would

17   work a material difference here.

18         The final three things, Your Honor.  There was

19   the -- as I looked at it, it's jumped out to me -- was the

20   differences between some of these was those who had

21   significant involvement in preplanning, and you could tell

22   from their messages that they knew what they wanted to do on

23   January 6th for weeks before they got here.  There -- which

24   is not Mr. Wilkerson.

25         There was the debriefing of the FBI.  You know,

1    that's a different situation.  That's when you probably have

2    a lawyer, but you certainly know what you're charged with.

3    You're informed of your rights.  You're making the choice to

4    walk into the FBI, and there should -- there should be no

5    confusion about what's going on at that time.

6        Apparently some of these folks who -- some of them

7    even received probation, but other ones have found a way to

8    not be able to do that and get through it truthfully; to lie

9    or misrepresent or minimize or things.  And, you know,

10   that's -- there's numerous places where the rubber hits the

11   road, but that's one that I think is a significant

12   difference here that can give the Court confidence on

13   probation as being sufficient without the need for home

14   detention.

15       And I've already covered and the Court's well

16   aware of the activities that day in terms of how it compares

17   with the other cases.  And so I feel like in that sense, all

18   told, I've tried to present sufficient reasons why, while

19   probation is not appropriate in the standard case or the

20   average case, that there are reasons why it is sufficient

21   under 3553(a) here.

22       THE COURT:  Very well.  Thank you.

23       MR. RIPKE:  Thank you, Your Honor.

24       THE COURT:  All right.  Mr. Wilkerson, anything

25   you'd like to tell me before I impose your sentence?  Step

```
 1    right up.
 2              THE DEFENDANT:  Yes, Your Honor.
 3              THE COURT:  You can join him, if you'd like,
 4    Mr. Ripke.
 5              THE DEFENDANT:  Good afternoon, Your Honor.
 6              THE COURT:  Good afternoon.
 7              THE DEFENDANT:  I just want to apologize if this
 8    doesn't come out very fluid because I'm absolutely riddled
 9    with anxiety right now.
10              First of all, I wanted to apologize for my actions
11    in the situation; not because I got caught but because I'm a
12    man of integrity, and I know --
13              THE COURT:  Step just a little closer to the
14    microphone so the court reporter can pick you up.  You're
15    doing fine.
16              THE DEFENDANT:  I want to apologize for my actions
17    not because I got caught, but I am a man of integrity, and I
18    am a man of honesty, and it is absolutely embarrassing to
19    have to be here and be a part of this because I know better.
20    I was raised better.  And it just -- every time I think
21    about it, it just -- I can't help but think how much this is
22    going to affect me throughout my life in the line of work
23    that I'm in, and it's just --
24              THE COURT:  So apart from the implications for
25    your life, sitting here now ten months later, I'm sure
```

1    you've reflected on the events of that day and your role in

2    them.  Still think it was a good day?

3                 THE DEFENDANT:  No.

4                 THE COURT:  What are your thoughts about what --

5                 THE DEFENDANT:  No, Your Honor.  It was not a good

6    day.  It's embarrassing; not just for me, but for our

7    country in light of the entire world.

8                 It -- there are ways to -- I wasn't there to be

9    against the government.  I was there to see for my own eyes

10   what was going to happen.

11                Those comments that I made in the message to the

12   young woman weren't about the government.  It was about the

13   media.

14                My -- the biggest -- my frustration that I

15   developed from watching influencers and, you know, being

16   triggered wasn't about the government.  It was about what

17   was being portrayed, and --

18                THE COURT:  And just -- you know, let's just have

19   a conversation here, right?  You know, you said that the

20   event wasn't being portrayed as it was; that it was much

21   more diverse; that there were folks from all different walks

22   of life there; that there was no violence until the Capitol

23   Police started to set off the percussion bombs.  And that

24   wasn't true, so why did you say that?  And do you still

25   believe that?

1          THE DEFENDANT:  I don't believe that it -- the way

2     I portrayed it in the message of it being, you know, good,

3     it was not good.  What I meant to say or like the things

4     that I saw were it wasn't as bad as people portrayed it; you

5     know, people climbing up the walls in the pictures when

6     there are stairs on both sides, but you only saw like people

7     climbing up the wall.  Like it was -- it was just -- just

8     everything that --

9          THE COURT:  So, you know, whether it was seven

10    minutes or eight minutes, clearly, you know, you saw broken

11    glass.  You heard the sirens.  You know, I assume you saw

12    folks squaring off with Capitol Police.  Did you think twice

13    and say, well, maybe this isn't such a good idea?

14         THE DEFENDANT:  I did, Your Honor.  Before I went

15    in and I was looking around, it was like that period of time

16    was so short, but it also felt like an eternity.  I was not

17    thinking to the capacity that I should have been but more of

18    just observing.  And I -- you know, at the time I didn't

19    know whether to go in, whether to stay outside.  I didn't

20    know where my friends were.  That's who I was trying to get

21    ahold of on the walkie-talkies.

22         I didn't know what to do at that time.  I wasn't

23    thinking in a complete adult manner.

24         Whenever I -- when I was inside, and I saw people

25    taking signs off of walls and messing things up, that's

1   whenever I knew it was like, okay, I have to go.  I have to

2   get away from all this.  This is going to be way worse than

3   it already is.  This is not going to end good at all.

4               THE COURT:  Did you have a sense of what the goal

5   was when you all were walking down there and decided to go

6   in?  What did you think was going to happen?

7               THE DEFENDANT:  I didn't -- I don't know.  I

8   didn't know what was going to happen honestly.

9               Whenever I saw people that looked like they had a

10  goal and they were there for a reason other than just being

11  there is when I thought --

12              THE COURT:  Did you know that the senators were in

13  the process of certifying the election?

14              THE DEFENDANT:  No, I didn't know that.

15              THE COURT:  Okay.  Did you know that the vice

16  president was there?

17              THE DEFENDANT:  No, I didn't know that.

18              THE COURT:  Were you involved in politics at all

19  before this?

20              THE DEFENDANT:  No, Your Honor.

21              THE COURT:  Anything else?

22              THE DEFENDANT:  No, Your Honor.

23              THE COURT:  Okay.

24              All right.  Stay up there.

25              The Court has considered all of the factors that I

1   have to consider, and as you know from reading the memos

2   there are a lot of things that we take into account when

3   fashioning a sentence, even a misdemeanor sentence, and we

4   spend a lot of time and effort trying to decide what the

5   right sentence for each individual person who appears before

6   us is.  And I hope you appreciate the formality and the

7   dedication with which not just the Court but the attorneys,

8   probation, my staff devotes to these sentences and these

9   cases.  I mean, this is serious business.  It's not just

10  going to court and paying a traffic ticket, okay?

11         THE DEFENDANT:  Yes, Your Honor.

12         THE COURT:  And that's part of how our government

13  works, right?  This is our particular role in government.

14  Congress has its goal.  The Executive Branch has its goal.

15  And there are certain rules of the road that we all follow

16  as part of our democracy, as part of our government, right?

17  And that's why we take these things, particularly January

18  6th, so seriously.

19         THE DEFENDANT:  Yes, Your Honor.  And this has

20  renewed my faith in the government because I'm -- you know,

21  if this had happened in any other country, I would probably

22  be dead.  And I realize that, and that's -- you know, that's

23  one of the reasons why, like I say, I still have my faith in

24  the federal government because I am appreciative of the fact

25  that I am alive.

1          THE COURT:  Okay.  And, you know, each one of

2     these cases is different, and each one has different

3     considerations.  There are, you know, individual men and

4     women who stand before us with different stories, with

5     different levels of involvement, and we try to make

6     individualized determinations.

7          We start with, you know, the offense and what you

8     did.  And it is true that you played a far lower role or

9     lesser role than many others that day.  You were not an

10    organizer or a planner.  You didn't break any windows.  You

11    did knock down any doors.  You didn't steal anything.  You

12    didn't assault any police officers.  You didn't bring any

13    weapons.  You didn't make your way to the Senate floor.  All

14    of those factors distinguish you from other folks that we

15    may see in these cases.  And, as Mr. Juman says, that's why

16    you're here on a single misdemeanor count as opposed to the

17    felony offenses that many others will face.

18          But, again, that does not mean that you bear no

19    responsibility for what happened that day.  And I take you

20    for your word that you are remorseful and that you have,

21    upon reflection, come to understand how dangerous that day

22    was.

23          And it's also important to note in all of these

24    sentences that while your conduct may have been nonviolent,

25    it was the presence of the mob and each and every one of the

1   people who decided to go into the Capitol that led to the

2   police being overwhelmed and that enabled the violence to

3   occur and for folks to die that day.

4          And it was not a good day.  It was a terrible day.

5   It was a terrible day primarily for the five people who

6   died.  It was a terrible day for the congressional staffers

7   who were cowering in their offices waiting for their doors

8   to be broken down and not knowing who was on the other side.

9   And it was a terrible day for our democracy generally.  And

10  you may not fully appreciate that, but I would counsel you

11  to, you know, think about that and to do some reading and to

12  study the way that our government works and talk to some

13  people about that to get a better understanding of the

14  overall effects of what happened that day.

15          THE DEFENDANT:  Yes, Your Honor.

16          THE COURT:  I also have to consider you; you know,

17  your history and your characteristics.  I don't know you,

18  but based on what I've read you strike me as a pretty

19  average guy, right?  High school grad, some college, very

20  minor prior criminal record, solid employment history -- as

21  your lawyer said, you've earned a solid living

22  consistently -- hard worker, employable skills.  You started

23  your own business.

24          You know, the government is focused on whether you

25  are remorseful or not.  It is true you did not express

1    public support for the riot afterwards.  You didn't go on

2    national television.  But your texts to your friend were

3    troubling, okay?  And as I acknowledged with your counsel, I

4    have to determine where that fits in to your overall

5    expression of remorse.

6            In terms of other folks who have been sentenced,

7    you know, I agree with Mr. Juman.  It is very difficult to

8    make these fine distinctions between one sentence and

9    another, particularly when we're dealing with sentences of

10   weeks and months as opposed to years, and there will be, in

11   all of these cases, once everything is said and done, some

12   disparity in how folks are sentenced between different

13   judges and even by particular judges.  And, you know, once

14   all of these cases are done and dusted that will become

15   apparent; but that said, we try to generally make sure that

16   there aren't significant disparities between cases, and my

17   experience thus far is that the government has tried its

18   best to, in its recommendations, ensure that similar people

19   are treated alike.

20           So where does that leave us?

21           I could easily conclude that a short period of

22   incarceration is appropriate in this case, but because I

23   think the government is in the best position to broadly

24   assess all of these cases, not just the ones before me, I

25   will accept their recommendation and probation's

1    recommendation that a sentence of incarceration is not

2    necessary in this case.

3            That leaves the government's recommendation for a

4    period of home confinement.  I understand where the request

5    is coming from, but I think that a fine along with community

6    service is a more appropriate sentence under the

7    circumstances.

8            I agree with your counsel that it is important for

9    you to continue to be able to work and earn a living, and

10   so, you know, a period of home confinement that allowed you

11   to go work, particularly if it was to stay places at jobs

12   overnight, would only amount to a curfew, which I'm not sure

13   is an appropriate message to send under the circumstances.

14           With respect to a fine, I know that probation has

15   determined that you do not have the ability to pay, but with

16   due respect to that recommendation, you're a hard working

17   guy.  You've shown, you know, an ability to earn a living.

18   You have a job.  You're reporting positive, you know,

19   income, even through the pandemic.  You don't have any

20   dependents.  You have some liquid assets.  So for that

21   reason I think that a fine is a more appropriate sentence in

22   this case.

23           In terms of the term of probation, this is more of

24   an art than a science.  I am troubled by the indication in

25   at least one of your texts that you would show -- you might

1    show up again if some call to action were to come out.  I

2    don't know that that's the case.  That might be bluster.

3    You may just have been trying to impress a friend.  Maybe

4    you've rethought all of that, but in an abundance of caution

5    I think a longer term of probation is appropriate, and under

6    the law you can apply for a reduction in your period of

7    probation at some point, and the Court will assess that if

8    that request were to come.

9           So with that, pursuant to the Sentencing Reform

10   Act of 1984 and in consideration of the provisions of 18 USC

11   3553, it is the judgment of the Court that you, John

12   Clarence Wilkerson, IV, are hereby sentenced to a term of 36

13   months of probation on Count 4.

14          In addition, you are ordered to pay a fine of

15   $2,500 and to perform 60 hours of community service.  In

16   addition, you are ordered to pay a special assessment of $10

17   in accordance with 18 USC 3013.

18          While on supervision, you shall abide by the

19   following mandatory conditions as well as the standard

20   conditions of supervision, which are imposed to establish

21   the basic expectations for your conduct.  The mandatory

22   conditions include you must not commit another federal,

23   state or local crime.  You must not unlawfully possess a

24   controlled substance.  You must refrain from any unlawful

25   use of a controlled substance.

1          Ms. Gavito, there's a testing provision in here.

2     Is that appropriate?  Is there any history of substance

3     abuse that would warrant a drug testing condition?

4          THE PROBATION OFFICER:  Your Honor, the mandatory

5     testing condition may be removed, if Your Honor so wants

6     that.

7          THE COURT:  Okay.  I did not see any significant

8     controlled substance history so we're going to -- we're

9     going to delete the unlawful use of a controlled substance

10    and the controlled substance testing provision.

11         THE PROBATION OFFICER:  Yes, Your Honor.

12         THE COURT:  You must make restitution in

13    accordance with 18 USC 3663 and 3663A or any statute

14    authorizing a sentence of restitution.

15         The Court authorizes supervision and jurisdiction

16    of this case to be transferred to the United States District

17    Court for the District of Maryland.

18         The fine shall be payable within one year of the

19    judgment.

20         You are ordered to make immediate restitution to

21    the Architect of the Capitol in the amount of $500.  The

22    Court waves any interest or penalties that may accrue on the

23    balance.

24         Restitution payments shall be paid to the Clerk of

25    the Court of the District of Columbia for disbursement to

1    the following victim:  the Architect of the Capitol.  And

2    the address will be indicated in the judgment.  The fine

3    shall be payable to the clerk of this court.

4            You shall also comply with the following special

5    conditions.

6            Financial information disclosure.  You must

7    provide the probation officer access to any requested

8    financial information and authorize the release of any

9    financial information.  The probation office shall -- may

10   share financial information with the U.S. Attorney's Office.

11           Within 30 days of any change of address, you shall

12   notify the clerk of the court of the change until such time

13   as the fine obligation is paid in full.

14           The probation office shall release the presentence

15   report to all appropriate agencies, including the U.S.

16   Probation Office in the approved district of residence in

17   order to execute the sentence of the Court.

18           You have the right to appeal the sentence imposed

19   by this Court if the period of imprisonment is longer than

20   the statutory maximum.  If you choose to appeal, you must

21   file any appeal within 14 days after the Court enters

22   judgment.

23           You also have the right to challenge the

24   conviction entered or the sentence imposed if new and

25   currently unavailable information becomes available to you

1    or on a claim that you received ineffective assistance of

2    counsel in entering a plea of guilty to the offense of

3    conviction or in connection with this sentencing.  If you're

4    unable to afford the cost of an appeal, you may request

5    permission from the Court to file an appeal without cost to

6    you.

7              Any other objections, Counsel?

8              MR. RIPKE:  No, Your Honor.

9              THE COURT:  Okay.  Mr. Wilkerson, you will be

10   under these conditions.  If you were to violate the

11   conditions, just like your, you know, pretrial conditions, I

12   will get a report.  I'd have to bring you back in, and we'd

13   have to resolve that, so, you know, don't put me in that

14   position.  Don't put yourself in that position.  You've been

15   compliant with all of the conditions thus far, and I fully

16   expect that you'll be able to continue to do that, okay?

17             THE DEFENDANT:  Yes, Your Honor.

18             THE COURT:  All right.  Good luck to you.

19             MR. JUMAN:  Your Honor, I'm sorry, at this time

20   the government moves to dismiss Counts 1 through 3.

21             THE COURT:  So ordered.

22                  (Whereupon the hearing was

23                   concluded at 3:00 p.m.)

24

25

**CERTIFICATE OF OFFICIAL COURT REPORTER**

I, LISA A. MOREIRA, RDR, CRR, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability.

Dated this 22nd day of November, 2021.


/s/Lisa A. Moreira, RDR, CRR
Official Court Reporter
United States Courthouse
Room 6718
333 Constitution Avenue, NW
Washington, DC 20001